21

FILED

2010 JUN -3 PM 12: 34

M.L. HATCHER, CLK
U.S. BANKRUPTCY COURT
W.D. OF WA AT SEATTLE
BY_____ DEP CLK

# IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

In Re:

SCOTT C TOWNLEY and
STEPHANIE TASHIRO-TOWNLEY,

    Respondents,

Chapter 13 Case No.: 09-22120

DEBTOR'S RESPONSE IN OPPOSITION TO
MOTION FOR RELIEF FROM STAY BY THE
BANK OF NEW YOURK MELLON F/K/A THE
BANK OF NEW YORK AS TRUSTEE FOR
THE CERTIFICATEHOLDERS CWABS, INC.,
ASSET-BACKED CERTIFICATES, SERIES
2005-10 THROUGH IT'S SERVICING AGENT
LITTON LOAN SERVICING LP

PROOF OF SERVICE

MOTION TO DENY RELIEF FROM STAY

OBJECTION FOR LACK OF PROOF OF
CLAIM

    COME NOW, Scott Townley and Stephanie Tashiro-Townley, Debtors, and

respond to   Motion for Relief from Stay, filed by The Bank of New York Mellon FKA

The Bank of New York as Trustee for the Certificate Holders CWABS, Inc. Asset-

-1-

Backed Certificates, Series 2005-10 through its Servicing Agent Litton Loan Servicing LP, Movant, and present unto the Court as follows:

1. Movant(s) in this case having such an unclear description. By the description alone, Movant seems to be unaware of exactly who they are/represent. With 5 individual parties joined as one, there is an incredible lack of clarity regarding the real party in interest. Are there additional indispensable parties not joined in their motion?

2. Debtors object to Movants' declaration of being the "Creditor", and denies the existence of Movants' claim to "its security interests." Debtors further move with objection to deny Movants' motion waiving the provisions of F.R.B.P. 4001(a)(3), and denies ALL of the allegations made in its motion unless specifically admitted here.

3. Debtors admit to signing a note and a deed of trust for purposes of purchasing their home, however, these documents were executed and delivered to parties other than the Movant.

4. The Deed of Trust was issued to a separate party, COUNTRYWIDE HOME LOANS, INC. (now defunct) the named beneficiary on the Deed of Trust. It is interesting to note the "pending foreclosure" that movant describes, has expired by Washington Statute (in excess of 12 months here where statute provides only 30 days extension beyond the sale date).

5. There are **no recorded assignments** of the subject deed of trust and no evidence of ownership provided other than redacted copies of the documents THAT ARE NOT CERTIFIED COPIES. THE MOVANTS EXHIBITS ARE NOT TRUE, CERTIFIED COPIES OF THE ORIGINAL DOCUMENT IN ITS CURRENT

STATE.

6. **The subject note is no longer negotiable, nor is the movant a holder in due course, and further, the obligation has been discharged, as a matter of operation, as movant and all counterparties, servicers, and agents, were listed in the schedules of the debtor and parties provided no objection prior to discharge in respondent's Chapter 7 bankruptcy case filed October 27, 2003, No. 03-23797 and discharged January 28, 2004.**

7. In offering guidance in this matter, Respondents have included copies of In re: Jacobson #08-45120, the decision being entered on March 10, 2009, in the Western District of Washington Bankruptcy Court (Exhibit A). The decision by Phillip H. Brandt provides some clarity with regard to the issue at bar.

8. Further, Respondents have filed a UCC, #2010-139-6825-1, an acceptance of assignment of UNITED STATES OF AMERICA LAND PATENT # 32, with the allodial protections in effect against the subject property since December 5, 1884, signed and sealed under signature of the President of the United States of America, Chester A. Arthur.

The ultimate defense of the underlying subject UNSECURED DEBT here is that of payment of the originating investor real party in interest, by a third party, and discharge of the obligation. The originating investor has been fully or partially paid what was owed it for the funds loaned, not by a party purchasing the ownership of Debtor's obligation, which has the effect of fully or partially discharging Debtor's obligation.

Examples of these 3rd party sources are credit default swaps and other forms of

insurance, cross-collateralization, over-collateralization, reserves,

and bailouts from the Federal Reserve and U.S. Dept. of Treasury.

The first step here is for Movant to prove that it is the real party in interest.
The only real party in interest is the original investor that supplied the funds that were
loaned in exchange for the instrument (the note). Movant is not the original investor,
and is not the real party in interest. Only after the precise identity of the real party in
interest has been proven can Movant then prove that it has actual, full and complete
authority to act on behalf of the real party in interest, which is something that it must
prove  If it cannot prove this, then the real party in interest must be joined as a party. If
Movant can prove that it has this authority, then it must prove that the instrument is
negotiable. Then it must prove that the real party in interest is a holder in due course.
Then it must prove the extent to which the Debtor's obligation has not been discharged.
The vast majority of notes and deeds of trust entered into between the
years 2001 and 2007 were securitized, and this is true regardless of whether the note
and deed of trust recognize this fact or not.  To the extent that the obligation has not
been discharged, Movant must prove that the obligation remains secured by Debtor's
residence. Only after this can Movant then proceed to enter into the analyses within 11
U.S.C. § 362 and 361.

9.      Movant does not have standing to enforce the note, as on **line 11 of page 2 of
their Motion** at bar, they admit that **their claim is "colorable" at best**, and there has
been a failure to join indispensable parties. Debtor demands strict proof that: the
endorsements were made to the proper entities; all endorsements were properly
executed; properly executed at the appropriate time by the appropriate parties and not

made subsequently in order to clean up the facial appearance of the documents; that Movant is the real party in interest and has the right to enforce the note for its own benefit, or that if it does so with full and complete authority to act on behalf of the real party in interest.

The issue of full and complete authority is complicated in cases when the obligation is part of an ASSET -BACKED CERTIFICATE, such as in this case.

For any party acting on behalf of an asset-back certificate Trust their powers must be spelled out within the terms of the Pooling and Service Agreement ("PSA") for that Trust. Most PSA's grant only limited powers to MBS Trustee's. They do not grant them the power to stand in the shoes of the real party in interest unless there is a special document signed by at least a certain percentage of the MBS certificate holders granting them special powers pertaining to specific claims and litigation. Full authority to act on behalf of the Trust must include the authority to enter into compromise settlements in litigation. Furthermore, the authority must be in accordance with the terms of the Bond Indenture of the mortgage bond held by the real party in interest, received by the investor that funded the loan when the AB certificate was purchased, that spells out the terms of the agreement between the Bond Issuer and the Bondholders. Only the investor has the right to enforce the note.

10.     Movant does not have standing to bring this Motion and the real true party in interest must be joined in this proceeding before a motion for relief from stay can be entertained by the Court. See for example, *In re Kang Jin Hwang* 396 B.R. 757 (Bankr.C.D.Cal.2008); *In re Vargas*, 396 B.R. 511 (Bankr.C.D.Cal., 2008). The right to enforce a note on the noteholder's behalf does not convert the noteholder's agent into a

real party in interest. *Id.* at 396 B.R. at 767, quoting 6A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1553; *In re Jacobson*, 402 B.R. 359, 366 (Bankr. W.D.Wash., 2009). The holder of the note and not the servicer or the collecting agent, must be the moving party, and the party to whom relief is granted, and must be so named in the pleadings. *Id; Kang Jin Hwang, supra; Vargas, supra.* Pursuant to FRCP 17(a) and 19(a), applicable via Rules 9014, 7017 and 7019, the real party in interest is the only party that can proceed in this action on behalf of the beneficiary of the note in question and their joinder is required. A federal court's jurisdiction is dependent upon the standing of the litigant, which includes both constitutional standing and prudential standing. *Valley Forge Christian Coll. v. Am. United for Separation of Church and State*, 454 U.S. 464, 472 (1982); *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

Constitutional standing under Article III requires, at a minimum, that a party must have suffered some actual or threatened injury as a result of the defendant's conduct, that the injury be traced to the challenged action, and that it is likely to be redressed by a favorable decision.

*Id; United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551 (1996); *Jacobson, supra* at p. 11. Constitutional standing is a requirement of Article III of the Constitution, is a threshold jurisdictional requirement, and cannot be waived. *Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co.*, 219 F.3d 895, 899-900 (9th Cir. 2000); *Jacobson, supra* at p. 12.

11.   A litigant must also have "prudential standing," which stems from rules of practice limiting the exercise of federal jurisdiction to further considerations such as orderly management of the judicial system.

*Pershing Park*, 219 F.3d at 899-900; *In re Godon*, 275 B.R. 555, 564-565

(Bankr. E D. Cal. 2002) *(citing Bender v. Williamsport Area Sch.* Dist., 475

U.S. 534, 541-42 (1986).

*Id.* Prudential standing requires that a plaintiff must assert "his own legal interests as

the real party in interest," *Dunmore v. United States*, 358 F.3d 1107, 1112 (9 Cir. 2004),

as found in FED. R. CIV. P. 17, which provides "[a]n action must be prosecuted in the

name of the real party in interest. Furthermore, FED. R. CIV. P 19 requires mandatory

joinder of every person with an interest in the note if not doing so could lead to

inconsistent results in different proceedings affecting the same subject matter. *Kang*

*Jin Hwang, supra* at 7. Foreclosure agents and servicers must prove they have

authority to act for a party that has standing. *In re Scott*, 376 B.R. 285

290 (Bankr. D. Idaho 2007); *Kang Jin Hwang*, 396 B.R. at 767; *Jacobson, supra* at 12.

12.      A nominee or agent must also show that has actual authority from the true party

in interest to act on its behalf and it cannot be assumed that it continues to have such

authority even if granted it in the original deed of trust. See *In re Mitchell*,

Memorandum Opinion, p.8, BK-S-07-16226-LBR, (Bky. D.NV. 2008). *Mitchell* was

designated as the lead case for Motions to Lift Stay filed by MERS in 28 cases, listed

by case number therein, in which an order for joint briefing was issued because the

issues were substantially the same. Prior to oral argument MERS attempted to

withdraw all but 4 of the motions. The mere fact that a party, such as MERS, is named

as the beneficiary in a deed of trust is insufficient to enforce the obligation. It must truly

be the beneficiary or join the true beneficiary in the action. Many documents contain

statements that admit that MERS or the servicer is not the true beneficiary. They also

contain contradictory statements stating that they are the beneficiary in one place and

that it is only the nominee in another.

13.     An entity named as the beneficiary on a deed of trust or who has been assigned the deed of trust may not enforce it if not the holder of the note.

If a note has been securitized into a pooling trust, the trustee may enforce the note. "If a loan has been securitized, the real party in interest is the trustee of the securitization trust, not the servicing agent. See *LaSalle Bank N.A. v. Nomura Asset Capital Corp.*, 180 F.Supp.2d 465, 469-71 (S.D.N.Y.2001) ("*LaSalle-Nomura* "); accord, *LaSalle Bank N.A. v. Lehman Bros. Holdings, Inc.*, 237 F.Supp.2d 618, 631-34 (D.Md.2002) ("*LaSalle-Lehman* "). *Kang Jin Hwang, supra* at 766. But as stated the Trustee is the real party in interest if the PSA and the Bond Indenture grant it that status and do not take away that status in another section of the document, or if they have an authorization signed by at least the percentage of certificate holders as the PSA requires.

14.     Additionally, if a power of attorney is presented to this Court and it refers to pooling and servicing agreements, the Court needs a properly offered copy of the pooling and servicing agreements, to determine if the servicing agent may proceed on behalf of plaintiff. (*EMC Mortg. Corp. v. Batista*, 15 Misc 3d 1143(A) [Sup Ct, Kings County 2007]; *Deutsche Bank Nat. Trust Co. v. Lewis*, 14 Misc.3d 1201(A) [Sup Ct, Suffolk County 2006]).

*HSBC Bank USA, N.A. v Valentin*, 1/30/2008, 18 Misc 3d 1123(A), 2008 NYSlipOp 50164(U), ¶ 3. Again, as the facts regarding these transactions are coming to light, a copy of the pooling and servicing agreements, is necessary, as is the document, if

separate, that sets forth the terms of the powers of the Trustee to the pool, because even the Trustee may not have the powers to act on behalf of the Trust, let alone the servicing agent for the Trustee of the pool.

And again the Bond Indenture must also be produced to prove actual authority to act on behalf the Trust and the Certificate (Bond) Holders. This is because the PSA is contract between the "Lender" as stated in the Deed of Trust, which wasn't really the lender but played the role of the lender in the transaction, the "Master Servicer" and the "Trust." But this contract does not include the investor (certificate holder), who is the real party in interest and the only party entitled to enforce the note, and accordingly the only party with the power to grant authority to act on its behalf.

15.     It has customarily been the practice in bankruptcy court and is generally preferred in all Courts to not insist on strict application of the Rules of Evidence, in the interest of the efficient and inexpensive administration of justice. But the MBS or AB system has been one big giant fraud and there have been many reported instances that have brought the veracity and authenticity of documents in mortgage foreclosure cases into doubt. And there are generally gapping holes in proof of the history of ownership and assignments of the notes and in the proof of their chain of custody, that would be necessary to fairly prove the identity of the real party in interest and its connection to the party seeking to act on its behalf are so glaring, there must be compliance with the Rules of Evidence, such as those for competency of witness, personal knowledge, hearsay and authenticity, not to mention matters such as relevance of factual assertions contained in documents, and sufficiency of proof. Many of the cases cited

herein strictly enforced the evidentiary rules in these cases, because various facts in

the cases placed the veracity of the documentary evidence in doubt. For example, *In re*

*Mitchell*, supra at 13-14; *In re Vargas*, 396 B.R. 511, 517 (Bankr. C.D. Cal. 2008).

At a minimum, there must be an unambiguous representation or declaration

setting forth the servicer's authority from the present holder of the note to collect

on the note and enforce the deed of trust. If questioned, the servicer must be

able to produce and authenticate that authority.

16.     Jacobson at 18. A further development has come to light that makes even these

requirements insufficient. It is necessary to obtain proof that the original funding came

from the Asset-backed Certificate that is seeking to enforce the note, as well proof of

the identity

of the specific persons or entities that invested the funds that were loaned to Debtor,

and a copy of the bond indenture specific to the loan being sought to be enforced.

*Nosek v Ameriquest* et al (Fed D Mass 2009)(Case 4:08-cv-40095-WGY), supra, is a

District Court decision in its second trip up the appellate ladder from

a Bankruptcy Court adversary proceeding. This questions extremely serious

matters to which every mortgage company, servicer, Trustee to a pool, and all attorneys

involved ought to pay real attention.

Up to the present time, mortgage companies and servicers have bluffed their way

through proofs of claim, motions for relief from stay and on to foreclosure, misleading

the Court as to their real role in the matter and without identifying for the Court the real

party in interest. The mortgage entities seeking to enforce a note and deed of trust, and

their attorneys were sanctioned severely in *Nosek* for not investigating and revealing to

the Court the real nature of the mortgage company's interest in the note, nor of their real

authority to enforce them.

It is not doubtful that Attorneys involved in enforcing mortgages in the past have not been aware of the true nature of the facts pertaining to the securitized loans they have enforced. If the nature of the transactions were apparent by mere review of the notes, deeds of trust and payment accountings, the economy would not have been nearly destroyed by the loss of trust in the system that arose when facts pertaining to MBS or AB Certificates began to come to the awareness of the investing persons and entities, particularly when the pool contains tranches that include subprime loans, as is true in most or all cases.

But *Nosek v Ameriquest* et al, Id, provides guidance that a greater standard of investigation and disclosure to the Court is required, due to the prevailing state of affairs, and of the fact that the nature of these transactions is no longer a mystery, and is becoming increasingly known to all.

17. **Movant must produce the original note**. Expert testimony is that 40% of the original notes in securitized trusts have been lost, destroyed or intentionally destroyed and some legal commentators have made estimates as high as 60%. The reason for intentional destruction of notes was to hide proof of fraud from the investors and to hide from the borrower the identity of the holder of the note, because of fear of liability pursuant to a plethora of causes of action. There have been a large number of documents presented in Courts, including notes that had fabricated endorsements, such as cleaning up gaps months and years after fact. The original note must be produced complete with original endorsements, and all must have been made by the proper party.

During the process of securitization and its aftermath, there were a

number of routine practices that had the effect of rendering the mortgage loans unsecured as a matter of law. One such practice was to separate ownership of the note from the deed of trust, where the security interest specifically follows the beneficial ownership of the note. When the note is split from the deed of trust, "the note becomes, as a practical matter, unsecured. A person holding only a note lacks the power to foreclose because it lacks the security, and a person holding only a deed of trust suffers no default because only the holder of the note is entitled to payment on it.

"Where the mortgagee has 'transferred' only the mortgage, the transaction is a nullity and his 'assignee,' having received no interest in the underlying debt or obligation, has a worthless piece of paper." 4 RICHARD R. POWELL, POWELL ON REAL PROPERTY, § 37.27[2] (2000).

In re Mitchell, supra at 8. Another event or state of affairs that has rendered mortgage loans unsecured as a matter of law is when there has been a separation of legal title to the note and equitable ownership of the note, in cases where the note has been satisfied in favor of the equitable owner of the note by a 3rd party that is not the holder of legal title to the note. Because of the commonality of such events during the securitization years, Movant must prove the degree to which the obligation of the Debtor to the real party in interest has been discharged. This is because in the ABC situation, there is little if any connection between the servicer's accounting of mortgage payments and the degree to which the obligation of the Debtor to the real party in interest has been discharged. In most cases the obligation to the investor, or real party in interest, has been paid off by a third-party source, such as a credit default swap obligee, other insurance, bail out funds, or a cross-collateralization source.

The "Lender" in the Deed of Trust, DECISION ONE MORTGAGE COMPANY, as in all

cases of MBS never provided funding for the loan, but merely arranged and/or
participated in the loan transaction.

The process by which the MBS and ABC were created was the sale of an interest in
**the income stream of payments** on residential mortgages. Typically, these mortgages
**did not exist** at the time the securities were purchased. Because of the way the
securities were packaged and sold, such huge pools of money were created that there
was incredible pressure on all participants in the process to go out and find people to
borrow money and sign their name to notes and deeds of trust. This lead to the laxity
of lending standards, huge commissions for all concerned, and pressure on borrowers
to take on loans they could never realistically be expected to pay back. The Originator
is the person or company that finishes a mortgage transaction by helping the borrower
complete all the necessary steps.

A mortgage originator could be a mortgage broker that or mortgage banker, and
represents the original mortgage lender, and receives
commissions or fees for its participation. The Sponsor is a Bank, Investment Bank, or
Mortgage Company, and acts as a financial conduit between the funding source and
the Closing Agent, which is an Escrow or Title Company. The Sponsors have access to
a warehouse line of credit from a Bank, Investment Bank, or other Financial Institution,
called the Depositor, that obtained the funds from the sale of the MBS and AB
certificates.
Depositors hold the funds from the sale of MBS certificates, some of which is used to
supply funds for mortgage loans paid through the aforementioned process, and also
obtain the notes executed by the Borrowers  The Issuer is a Bank, Investment Bank or
other financial institution that sets up the MBS and issues the certificates. The
Underwriter works with the Issuing Bank to set up the MBS and ABC, set up the various

-13-

tranches,

and make risks determinations of the various tranches. The Investor in the MBS and ABC situation must be a "Qualified Investor," which means that it satisfies legal criteria based on a level of sophistication in knowledge and experience in the securities markets, examples of which are fund managers, hedge fund managers, pension fund managers, high net worth individuals, corporations, government agencies and other money management fund managers. Servicers are financial institutions that administer and provide the mortgage payment collections activities and are supposed to pass through the stream of income in accordance with the terms of the PSA and the Servicing Agreements. The only real parties to the MBS transaction are the borrowers and the investors. The investor is the only party that purchased the note for value. None of theother intermediaries paid anything of value, rather all of them were paid value in exchange for "services."

Numerous reports have slowly unfolded that have explained how individuals on Wall Street systematically engaged in the greatest scheme of fraud in the history of the world. In fact, the complexity of the derivatives they created and the complex structure of personnel involved in their creation and valuation created a level of plausible deniability beyond the reach and comprehension of the regulatory agencies and even very sophisticated bankers and investors. If this were not so then it would not have led the world economy to the brink of collapse. At the heart of the "complexity" was the use of computer algorithms that took spreadsheet projections to levels of "sophistication" never seen before  The result was that when a computer spit out a value for mortgage backed securities, it was impossible to audit by hand. So Wall Street created something that was treated as the equivalent of money and the value of

this money was whatever Wall Street said it was. Expert testimony reveals that a huge

portion of invested funds were secreted away offshore and otherwise to individual

bankers and investment bankers. But every participant in the chain received

consideration beyond that which they would normally have received in traditional

mortgage loan transactions, largely but not entirely, due to the extremely heavy volume,

starting with mortgage brokers and appraisers, all the way through "Lenders," which

was not really lenders, intermediate selling banks, sponsoring investment banks,

underwriters, rating agencies, fund managers, subservicers, servicers, master

servicers, pool administrators, and top level pool tranche bondholders. At later stages,

only the intermediaries were making money. They have been reaping the benefit of

payments made and proceeds of foreclosures, even though they never invested as

much as a dime in loan funding. The Wall Street firms, whose stocks were traded

publicly, had no risk whatsoever. They were essentially capitalized by investors in their

stock, investors (Customers) in their financial products at a time when everyone was

searching for higher returns and greater safety, which is how these fraudulent products

were sold. Certain Wall Street firms and certain individuals in those firms made great

profit, which were in reality the proceeds of fraud and theft.

The way the loans were sold to borrowers turned the borrowers into

issuers of unregulated securities, contrary to the Truth in Lending Act, and to the

Securities Exchange Act of 1933 and 1934. They were advised that the value of their

properties would continue to rise and that they could simply refinance when no longer

able to afford to make the payments. They were advised that the ability to refinance

was assured because continued increase of property values was a certainty.

Therefore, they were sold the promise of a passive return on investment. It was quite

common that the mortgage backed securities were sold to investors before the loans

were made, before the notes and deeds of trust were executed and even before it was even known who the borrowers would be. They were further sold as backed by AAA ratings and insurance guarantees in the form of credit default swaps and private mortgage insurance. Though they began as negotiable instruments they were really unregulated securities and this was the original design.

When all the complexity and confusion is seen through, the only real parties to a mortgage loan transaction are the investor (the real source of the money that funded the loan) and the borrower (or "issuers of unregulated securities"). All other intermediary participants in the securitization process were superfluous entities without any value of their own placed at risk. Despite the computer driven valuations that were produced, the real value was zero for both investors and borrowers. Borrowers were increasingly persuaded and pressured into loans that would doomed to fail from the start, and were left with properties that whose real market value was sometimes half of the amount that they owed. The actual investors are the only parties that would have any real standing to make a claim on a note or deed of trust, because they are the only parties that provided any loan funding, though by the time they are run through the securitization process these notes are really unsecured as a matter of law. The fact is that the notes were rendered non-negotiable because of the way that they were pooled into Real Estate Mortgage Investment Conduits ("REMIC"), the MBS Pool Trusts, which by law are not permitted to own any assets, and by the way mortgage payments and funds from other sources passed through the REMIC, not with payments on any individual note being applied to the funder of the particular loan, but by payment first to the top tranche and then downward, regardless of which tranche belonged the note upon which said payment was made. This rendered all the notes non-negotiable, with there being no holder in due course. The process and its aftermath has also rendered

the notes unsecured.

The geniuses on Wall Street that masterminded such incredibly ironic results may or may not have foreseen these legal effects of their creations, but this was really irrelevant to them inasmuch as their money had already been made. The investors have found themselves at a place where they either eat the entire loss or find a way to recover from the intermediary participants. They cannot and are not suing the borrowers, because even if they successfully established their status as holders, they would be subjecting themselves to the risk of being hit with all the defenses, claims and counterclaims under TILA, deceptive lending, securities violations, rescission, treble damages, usury and so forth. Investors are not making claims against borrowers, even when they are clearly identified as a single hedge fund. They are mostly filing large suits, such as class action suits, against intermediate participants such as the original sponsor investment banking firms, depositing banks and issuing banks that masterminded the entire process, and entities such as Citibank or **Countrywide**, because of fraud in the sales of the securities from the very beginning, and even after it had been established. None of these entities have defenses, claims and counterclaims, and they have no basis for claiming treble damages, interest, attorney fees and court costs.

Many of these suits can be brought against any and all intermediate participants, based on theories such as joint venture, common purpose, aiding and abetting, and RICO.

18. Additionally, the Debtors were granted a discharge in their Chapter 7 case, No. 03-23797 on January 28, 2004, with any previously existing claims against any TRUE real

party in interest being property of the US Trustee, debtor is willing to support actions of
the trustee in pursuit of these claims.  It is likely that the true party in interest is
responsible for numerous violations of State and Federal Law that could subject it to
serious financial and other liabilities that exceed the face value of the note.
It has often been speculated among many commentators that this is the
reason true parties in interest do not appear in these cases. For if they did, it would
amount to an admission that it is the holder in due course in a consumer real estate
transaction, which would make it liable for the actions of all prior holders of the note and
other causes of action, such as malfeasance performed by agents of the true party in
interest and those of its predecessors. Debtor will then likely file an adversary
proceeding alleging various causes of action, which may include a quiet title action, and
/or other irregularities, making enforcement by Movant and/or the true party in interest
impossible. Causes of action that are not atypical to transactions, such as that involved
in this case include: Failure to Join Indispensable Parties; Standing; Reconveyance;
Payment; Offset; Failure to Record --- Condition Precedent; Fraud in the Inducement;
Fraud in the Execution; Rescission; Reconveyance; Slander of Title; Breach of
Fiduciary Duty; Fraud in the Inducement; Fraud in the Execution; Negligence; Negligent
Supervision; Appraisal Error or Fraud; Unconscionable Predatory Lending Practices;
Unjust Enrichment; Identification Theft; Deceptive Practices; False Advertising;
Securities Fraud; Constructive Trust on Profits; Breach of Privacy, as well as statutory
causes of action under the following federal statutes, HOEPA; RESPA; TILA; RICO,
and possibly a quiet title action. Debtor asks that even if the true party in interest were
to be joined in this case and the proof required as set forth herein were provided,
Debtor asks that the action be tolled pending the results of their investigation and
complete and full responses to discovery have been received, as well as additional time

1  for the investigative report to be completed and time to prepare the adversary

2  complaint.

3  The bottom line is that, unbelievable as it may seem, the majority of

4  the securitzed mortgages written in the approximate time frame of 2001-2007 can be

5  rendered completely unsecured, due to fraud, which in the context of a bankruptcy proceeding

6  means that the Debtors would end up with a free house, absent the interest of the bankruptcy

7  estate in the amount of equity above the maximum exemption allowed by law. The US Trustee

8  however, realizing the uncertainty regarding Equity above the exemption, and the Land Patent

9  protection status invoked here, provides grounds for the US Trustee to abandon its claim against

10  the homestead property  This is the end result when the law is applied to the facts, when all the

11  facts are known.

12  There is no denying that the Debtors signed a note and a deed of trust and that

13  they obtained at least the illusion that he had accomplished the dream of

14  home ownership. On the other hand, mortgage loan payments made in the past and

15  any that may be made in the future are paid to entities that do not deserve it because

16  they never paid a dime that went to the purchase of the home in question.  THEY HAVE

17  NO VESTED INTEREST.  THEREFORE THERE CAN BE NO RISK OF LOSS.  The

18  same is true for the homes these entities foreclosed upon in the past and those they will

19  foreclose upon in the future. They were unjustly enriched. To the present date,

20  financially sophisticated intermediaries have been able to step in and bluff the court

21  system and recording offices because they had, or could pretend to have,

22  documentation in the form of notes and deeds of trust, that appeared on their face to be

23  valid, but which were at a minimum misleading, and often fraudulent, fabricated and

24  forged. The question then is whether the homeowner or some financial institution that

25  never funded the loan nor compensated, or intends to further compensate the source of

the funding is less deserving.

Even if Movant can prove it is the party entitled to proceed, that it has a valid security interest and that the obligation has not been discharged, it may not do so if it is in violation of the statutory duties and obligations it contractually bound itself to perform when it struck its agreement with the Department of the Treasury (of which the Debtors are certainly third party beneficiaries) as a condition for acceptance of government bailout funds pursuant to the Troubled Asset Relief Program ("TARP" or "TARP Funds") and/or otherwise.

**WHEREFORE, PREMISES CONSIDERED**, Debtors ask that this Court require the real party in interest to appear as a party to this proceeding, and to present strict proof that it is the real party in interest, or has full and sufficient authority to act on behalf of the real party in interest, as well as proof of all required elements as set forth above, with strict application of the Rules of Evidence, including proof of the amount, if any, of Debtor's obligation that remains undischarged, and based upon the extraordinary circumstances in today's economy, dismiss the motion or stay further action pending responses to discovery requests granting Debtor an opportunity to file an adversary complaint when the information is obtained by Debtor, and for such other and further relief as is just   Debtor reserves the right to assert additional defenses and rights as they arise.  RCW 62A.1-207.

Dated: June 3, 2010

By: _____

Scott C Townley, Authorization Representative

By: _____

Stephanie-Tashiro Townley, Authorized Representative